103,108

In the Matter of TRUST D CREATED UNDER THE LAST WILL AND
TESTAMENT OF HARRY DARBY.

(234 P.3d 793)

Opinion filed June 25, 2010.

*Jeffrey R. King* and *Phillip Johnson*, of Overland Park, were on the brief for appellant Marjorie D. Alford.

GREENE, J.: In this appeal we must decide the propriety of the district court's order approving modifications to an irrevocable testamentary trust created by the Last Will and Testament of Harry Darby, deceased. Marjorie D. Alford, a daughter of Darby and a first generation beneficiary of the subject trust, was successful in achieving an order of the district court approving the modifications, but she has perfected this appeal because the Internal Revenue Service (IRS) is not bound by such modifications unless approved by the highest court of the state. See *Commissioner v. Estate of Bosch*, 387 U.S. 456, 18 L. Ed. 2d 886, 87 S. Ct. 1776 (1967); *In re Estate of Keller*, 273 Kan. 981, 985-86, 46 P.3d 1135 (2002). For this reason, we granted Alford's motion to transfer the case from the Court of Appeals pursuant to K.S.A. 20-3017.

## FACTUAL OVERVIEW

On July 15, 1986, Darby executed his last will and testament, which established several trusts for the benefit of his daughters and sister. The only trust at issue in this appeal is that denominated by his will as "Trust D," which was to be established at Darby's death by a specific bequest in the amount of $240,000 to the trustee, The Commercial National Bank of Kansas City, to be administered and distributed as follows:

"A. The trustee shall, at convenient intervals but not less frequently than annually, pay an amount (as defined in the next sentence) each taxable year from Trust D to my daughter, MARJORIE D. ALFORD, if she is living at the time for the payment of such amount. The amount to be paid from Trust D in any taxable year as provided above may be paid in such installments during such year as the trustee deems advisable and shall be in the amount of Twelve Thousand Dollars ($12,000.00). I strongly recommend (but this recommendation shall not be deemed to be mandatory) that the payments to be made from Trust D shall be in monthly installments which shall be as nearly equal as possible. The amount to be paid shall be paid first out of the net income derived from Trust D and then out of the principal of Trust D if said net income should not be sufficient. Any excess income not needed to make the above payments shall be added to the principal of Trust D at such times as the trustee deems advisable.

"B. Upon the death of the last to die of my daughter, MARJORIE D. ALFORD, and me, the funds then comprising Trust D, shall remain in trust, and thereafter

the trustee shall continue to pay at convenient intervals the sum of Four Thousand Dollars ($4,000.00) each to the three daughters of MARJORIE D. ALFORD, namely, DIANE CHRISTINE MUNKSGAARD, MARY CUBBISON RESTER, and JEAN ANNE ALFORD, for their lifetime, and upon the death of each, the trustee shall pay one-third of the funds then comprising Trust D to the issue per stirpes of the deceased daughter of MARJORIE D. ALFORD."

In addition to these provisions, the will contained numerous provisions applicable to all of the trusts so created, including the following provision restricting the powers of the beneficiaries:

"J. During the entire duration of the trust, each and every beneficiary of the trust shall be without power, voluntarily or involuntarily, to sell, mortgage, pledge, hypothecate, assign, alienate, anticipate, transfer, or convey any interest in the trust estate or the property constituting the trust estate or the income therefrom until the same is actually paid into his or her hands, and no interest of any beneficiary in, or claim to, the trust estate or any part of creditors of any beneficiary, or to judgment, levy, execution, sequestration, attachment, bankruptcy proceedings or other legal or equitable process."

In January 1987, Darby executed a codicil to his last will and testament, which increased the amount of the bequest establishing Trust D to $480,000, increased the amount of the annual distribution to Alford to $24,000, and increased the annual distributions to the second generation beneficiaries to $8,000 each. No further changes to the trust were effected by this codicil. Darby died 9 days after executing this codicil.

On July 27, 2009, Alford filed her "Petition for Modification of Testamentary Trust under the Kansas Uniform Trust Code" seeking modifications to the trust provisions as follows:

"Trust D shall be held, administered and distributed as follows:

"A. The Trustee shall distribute at convenient intervals, but not less frequently than annually, an amount equal to Forty Thousand Dollars ($40,000) annually to my daughter, MARJORIE D. ALFORD. Beginning January 1, 2010, this amount shall by adjusted on January 1 of each year by the same percentage change in the Consumer Price Index—Urban Wage Earners and Clerical Workers (CPI)—US City Average ALL ITEMS 1967-100 since January 1 of the prior year. I strongly recommend, but do not require, that such payments be made in monthly installments which shall be as nearly equal as possible. The amount to be paid shall be paid first out of the net income derived from Trust D and then out of the principal of Trust D if such net income is not sufficient. Any net income not so distributed shall be accumulated and annually added to principal.

"B. Upon Marjorie D. Alford's death, the assets then held in Trust D shall be distributed to such federal or state taxing authorities for payment of estate taxes as Marjorie D. Alford may appoint by a Will or other signed writing that is acknowledged before a notary public specifically referring to this power of appointment. In default of appointment or insofar as an appointment is not effective, the Trustee shall divide the Trust D into a number of equal shares so as to create one equal share for each of Diane Christine Munksgaard, Mary Cubbinson Rester and Jean Anne Petrick who is then living and one equal share for each of Diane Christine Munksgaard, Mary Cubbinson Rester and Jean Anne Petrick who is then deceased but who has descendants then living. Each share that is created for one of Diane Christine Munksgaard, Mary Cubbinson Rester or Jean Anne Petrick who is then deceased shall be distributed to the deceased daughter's descendants then living, per stirpes. Each share that is created for one of Diane Christine Munksgaard, Mary Cubbinson Rester or Jean Anne Petrick who is then living shall be distributed as follows:

"1. The Trustee shall distribute at convenient intervals, but not less frequently than annually, an amount equal to Eight Thousand Dollars ($8,000) annually to the daughter of Marjorie D. Alford for whom the trust share was created. The amount to be paid shall be paid first out of the net income derived from Trust D and then out of the principal of Trust D if such net income is not sufficient. Any net income not so distributed shall be accumulated and annually added to principal.

"2. Upon the death of the daughter of Marjorie D. Alford for whom the trust share was created, the assets then held in the daughter's trust share shall be distributed to the daughter's descendants then living, per stirpes."

Alford's petition alleged that her sole source of income "was her $24,000 annual distribution from Trust D" and that the "parties have determined that this annual sum is no longer sufficient to satisfy [her] basic living expenses." The petition also alleged that the modification to Article VII, paragraph B, was "appropriate to achieve Mr. Darby's tax objectives."

All of the identified qualified beneficiaries of Trust D voluntarily entered an appearance, waived notice to the hearing, and consented to the proposed modifications. No further facts were presented to the district court, and no evidentiary hearing was requested or conducted.

The district court approved the modifications, concluding in material part:

"4. The Court is authorized, under K.S.A. § 58a-411, to modify the Trust as set forth in the Petition because all of the qualified beneficiaries of Trust D consent to such modification and such modification is not inconsistent with a material purpose of Trust D. The Court is also authorized, under K.S.A. § 58a-412, to modify the Trust as set forth in the Petition because Trust D is not providing enough income to satisfy the basic living needs of Petitioner Marjorie D. Alford, and therefore circumstances exist that were not anticipated by the settler of Trust D, and modification will further the purposes of Trust D. Finally, the Court is authorized, under K.S.A. § 58a-416, to modify the Trust as set forth in the Petition because, under the terms that presently govern the administration of Trust D, at Petitioner Marjorie D. Alford's death a significant amount of federal generation-skipping transfer tax may be unnecessarily incurred by Trust D, and therefore modification will achieve the settlor's likely tax objectives, in a manner that is not contrary to the settlor's probable intention."

## STANDARD OF REVIEW

To the extent facts were alleged to the district court, there was no dispute as to those facts, and the court decided the matter on such undisputed facts and the written instruments. We have de novo review of cases decided on the basis of documents and stipulated facts. See *Ward v. Ward*, 272 Kan. 12, 19, 30 P.3d 1001 (2001); *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, Syl. ¶ 1, 744 P.2d 840 (1987). The sole question before us is whether Kansas law supports the actions of the district court in approving the modifications to the trust instrument; this requires that we construe and apply Kansas statutes, thus also calling for unlimited review by this court. *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009). We are not bound by the determination of the district court. *In re Estate of Haneberg*, 270 Kan. 365, 371, 14 P.3d 1088 (2000).

## OVERVIEW OF APPLICABLE STATUTES

As statutory authority for the proposed modifications, Alford urges us to consider—and the district court relied upon—the following statutes within the Kansas Uniform Trust Code, K.S.A. 58a-101 *et seq.*

K.S.A. 2009 Supp. 58a-411(b) and (c):

"(b) A noncharitable irrevocable trust may be terminated upon consent of all of the qualified beneficiaries if the court concludes that continuance of the trust is not necessary to achieve any material purpose of the trust. A noncharitable

irrevocable trust may be modified upon consent of all of the qualified beneficiaries if the court concludes that modification is not inconsistent with a material purpose of the trust.

"(c) A spendthrift provision in the terms of the trust is presumed to constitute a material purpose of the trust."

K.S.A. 58a-412(a):

"(a) The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settler, modification or termination will further the purposes of the trust. To the extent practicable, the modification must be made in accordance with the settlor's probable intention."

K.S.A. 58a-416:

"To achieve the settlor's tax objectives, the court may modify the terms of a trust in a manner that is not contrary to the settlor's probable intention. The court may provide that the modification has retroactive effect."

## DID THE DISTRICT COURT ERR IN APPROVING THE MODIFICATION INCREASING THE ANNUAL DISTRIBUTION TO ALFORD?

Alford contends on appeal that the proposed modification (Article VII, paragraph A) increasing her annual distribution amount is necessary to satisfy her basic living expenses and that this increase is consistent with Darby's "clear" intent "to ensure sufficient trust distributions to support Ms. Alford's basic needs." Alford points to no specific trust provisions to support this suggestion as to Darby's intent, but she argues that the doubling of her annual distribution in the will's codicil is indicative of Darby's intent to "properly support" Alford.

Applying Kansas law, a modification of this nature may not be approved despite consent of all beneficiaries unless it "is not inconsistent with a material purpose of the trust," K.S.A. 2009 Supp. 58a-411(b), or "because of circumstances not anticipated by the settlor, modification . . . will further the purposes of the trust." K.S.A. 58a-412.

*Inconsistent with a Material Purpose?*

First, we disagree that the "basic support" of Alford was a "material purpose" of this trust. Darby employed no language indicat-

ing any such desire, despite the ease of inserting a clear directive to the trustee in this regard, or to permit an invasion of principal by ascertainable standards for her basic support needs. This was clearly not a support trust. See *Miller v. Kansas Dept. of S.R.S.*, 275 Kan. 349, 354, 64 P.3d 395 (2003) (support trust exists when trustee is required to inquire into the basic support needs of the beneficiary and to provide for those needs). And we are not inclined to infer a material purpose to support Alford's basic needs when the express terms fail to indicate any such purpose.

"Material purposes are not readily to be inferred. A finding of such a purpose generally requires some showing of a particular concern or objective on the part of the settlor, such as concern with regard to a beneficiary's management skills, judgment, or level of maturity. Thus, a court may look for some circumstantial or other evidence indicating that the trust arrangement represented to the settlor more than a method of allocating the benefits of property among multiple intended beneficiaries, or a means of offering to the beneficiaries (but not imposing on them) a particular advantage." Restatement of the Law Third, Trusts § 65, comment d, p. 477 (2001).

We also disagree that the changes effected by the will's codicil are indicative of any intent to support Alford's basic needs. In the codicil executed within 6 months of the original will, Darby merely doubled his trust bequest as well as all the beneficiaries' annual distribution amounts. No language or circumstantial evidence supports an inference to create a support trust.

Whereas no direct or circumstantial evidence has been offered to indicate that a material purpose of the trust was to provide for Alford's basic needs, we note that a specific trust provision *does* substantially restrict the beneficiaries' rights and interests; this provision has been characterized as a spendthrift provision. In Kansas, a spendthrift provision is presumed to constitute a material purpose of the trust. K.S.A. 2009 Supp. 58a-411(c). Kansas law is in material contrast to the Uniform Trust Code, which specifically negates any such presumption. See Unif. Trust Code, § 411(c), 7C U.L.A. 498 (2004) (made optional in 2004).

A spendthrift trust has been defined as a trust created to provide a fund for the maintenance of a beneficiary and at the same time to secure the fund against his or her improvidence or incapacity.

Provisions against alienation of the trust fund by the voluntary act of the beneficiary or by his or her creditors are its usual incidents. *In re Estate of Somers*, 277 Kan. 761, 764, 89 P.3d 898 (2004).

Language nearly identical to Article IX, paragraph J (quoted above) of Darby Trust D was characterized as a spendthrift provision by this court in *Somers*. Notably, this court in *Somers* construed the spendthrift trust in a manner that prohibited a modification to enable distributions to life beneficiaries in excess of the specific monthly amount stated in the trust instrument, even though the additional distributions would be paid from the remainder interest. 277 Kan. at 771-72. Following *Somers*, the proposed modification at issue here would be inconsistent with the material purpose manifested by the spendthrift provision.

We conclude that the modification increasing the distribution amount to a first generation beneficiary (Alford) would be inconsistent with the obvious material purpose to preserve sufficient income and principal to fund the distributions to beneficiaries after Alford's death. Due to the limited factual presentation at district court, we have no way to determine whether the proposed increase in Alford's share may exhaust the trust's corpus to the extent that amounts specified to surviving beneficiaries cannot be funded, but *any* reduction in the corpus would seem to be inconsistent with the purpose to have sufficient funds to continue specified distributions to the second and third generation of beneficiaries. See Restatement Third, Trusts § 66, comment b, p. 494. It is beyond dispute that *any* increase in the annual distribution to Alford will reduce the remainder in trust to the third generation beneficiaries, who are to receive "one-third of the funds then comprising Trust D." Moreover, the increase is contrary to Darby's express direction to add to the principal any excess income not needed for the specified distributions.

For all of these reasons, we conclude that the proposed modification increasing Alford's annual distribution is inconsistent with material purposes of the trust and cannot be validated under K.S.A. 2009 Supp. 58a-411(b).

*Circumstances Not Anticipated by the Settlor?*

Under K.S.A. 58a-412, the subject modification increasing Alford's annual distribution may be approved if, because of circumstances not anticipated by the settlor, it would further the purposes of the trust and can be made in accordance with the settlor's probable intention. On appeal, however, Alford does not argue that there were circumstances not anticipated by Darby; indeed, there is no evidence in the record that indicates that Darby failed to anticipate that the value of future distributions would be devalued by routine inflation. In fact, he was willing to permit principal to be invaded for purposes of the specified distributions, but he recognized that income growth alone could someday *exceed* that necessary for the distributions, and in this event, he directed that it be added to the principal rather than to increase the distribution to Alford.

Courts have generally been more willing to allow modification for unanticipated circumstances where there are truly unforeseen events resulting in economic hardship, the incapacity of a beneficiary, the impossibility or imprudence of a trust provision, or the diminution in value of a trust asset. See, *e.g.*, *In re Nobbe*, 831 N.E.2d 835, 843 (Ind. App. 2005). Indeed, our appellate courts have allowed such modifications in precisely such unanticipated circumstances. See, *e.g.*, *Somers*, 277 Kan. at 770 (dramatic growth in the Trust's corpus was " 'a unique and unusual set of facts' "); *In re Harris Testamentary Trust*, 275 Kan. 946, 959, 69 P.3d 1109 (2003) (change in case law could not have been anticipated by settler); *White v. Kansas Health Policy Authority*, 40 Kan. App. 2d 971, 981, 198 P.3d 172 (2008) (change in legislation requiring additional language for trust to remain a supplemental needs trust). No such truly unforeseen circumstance has been shown here.

More important, however, is that the proposed increase has not been shown to be practicable given Darby's probable intention. Again, we have no basis in the record to determine what the impact of the increase would be on the corpus of the trust. Given the inherent diminution of the trust's overall value in order to fund the

proposed increase, we must consider that Darby's intent to flow excess income to future beneficiaries would be frustrated by the increase.

"[U]pon a finding of unanticipated circumstances, the court must further determine whether a proposed or contemplated modification or deviation would tend to advance (or, instead, possibly detract from) the trust purposes. This latter inquiry is likely to involve a somewhat subjective process of attempting to infer the relevant purpose or purposes of a trust from the general tenor of its provisions and from the nature of the beneficial interests, together with the family or personal relationships involved in the trust. In this process, *it is appropriate that courts act with particular caution in considering a modification or deviation that can be expected to diminish the interests of one or more of the beneficiaries in favor or one or more others.*" (Emphasis added). Restatement Third, Trusts § 66, comment b, p. 494.

We are simply not convinced that devaluation due to normal inflation should be considered an unanticipated circumstance where the settlor has specified on two separate occasions that the distribution be measured by a fixed dollar amount. If Darby's codicil and its increase in annual distribution amount (executed only 6 months after his execution of the will) indicates an objective to provide more income for Alford's basic needs—as suggested by Alford on appeal, why would not we find in that codicil an escalator to protect against future devaluation—just like the escalator contained in the proposed modification?

In the last analysis, Darby's recognition that income might exceed the amount needed for the annual distribution, and that any such excess be added to principal rather than fund larger distributions, is antithetical to any purported failure to anticipate the normal inflationary devaluation of the specified amount. We conclude that funding an increase will inherently frustrate his intention for this growth, as well as jeopardize—or at least reduce—distributions to the second and third generation of beneficiaries. For these reasons, the proposed modification to increase Alford's annual distribution cannot be validated as an unanticipated circumstance under K.S.A. 58a-412.

### DID THE DISTRICT COURT ERR IN APPROVING THE MODIFICATION GRANTING A LIMITED TESTAMENTARY POWER TO ALFORD?

Alford contends on appeal that the second modification to the trust (Article VII, paragraph B) achieves favorable tax treatment "consistent with Senator Darby's intent." See K.S.A. 58a-416. By granting Alford a limited testamentary power of appointment, the apparent intent of this modification was to vest the assets of the trust in Alford's taxable estate, thus subjecting them to federal estate tax rather than federal generation-skipping transfer tax (GSTT). Because the exemption for federal estate taxation exceeds the value of the trust assets, the modification was apparently intended to minimize federal tax liability.

At the outset, we note the curious nature of the power granted in this proposed modification. The language requires that the assets of the trust "shall be distributed to such federal or state taxing authorities for payment of estate taxes as [Alford] may appoint by a will [or otherwise]." The language then states that in default of such appointment (or if ineffective), the trust shall be divided into equal shares for each of the second generation beneficiaries. Although Alford claims on appeal that this language creates a "general testamentary power of appointment," we disagree. Instead, Alford would be granted only a limited power to appoint federal or state taxing authorities to receive a distribution for payment of estate taxes. The taxes to be paid are not limited only to Alford's estate taxes, but rather could include generically any and all federal and state estate taxes of anyone. We also fail to see any logical nexus whatsoever between the limited power granted and the specified consequences of default of such appointment—division of the trust into shares for each of the second generation beneficiaries. Finally, we find it curious that Alford seeks avoidance of the federal GSTT, which has been eliminated effective December 31, 2010. Pub. L. No. 107-16 § 501, 115 Stat. 38, 69 (2001); see 26 U.S.C. § 2601 (2006) *et seq.* Notwithstanding these curiosities, we analyze the validity of the proposed modification.

The tax problem addressed by the proposed modification is exposure to the GSTT. As described by Alford's brief on appeal:

"As drafted, the Will failed to account for the generation-skipping transfer tax ('GSTT'). *See* 26 U.S.C. § 2601, *et seq.* As a general rule (which applies here), the federal transfer tax system subjects assets to estate tax in every generation. Otherwise, assets fall under the GSTT. *Id.* 'The generation-skipping transfer tax is designed to tax these transfers of accumulated wealth to successive generations in much the same way that a gift or estate tax would have done if the property had been transferred outright by gift or inheritance.' *In re Estate of Tubbs*, 21 Kan. App. 2d 395, 399, 900 P.2d 865[, *rev. denied* 258 Kan. 858] (1995) . . . . As such, the GSST·'impos[es] a [45%] tax on transfers which skip generations.' *Id.* See also 26 U.S.C. § 2641(a) . . . .

"At the time of Senator Darby's death, the GSTT was subject to a $1 million exemption for the entirety of his estate. [Citation omitted.] Under the Will, Mr. Darby left over $7 million in separate trusts for his children and, upon their deaths, for their children. All of these trusts including Trust D, were designed to 'skip' estate taxation in the child's generation. *Id.* The GSTT is triggered, therefore, when the trust funds pass to the second generation of beneficiaries (in the case of Trust D, Ms. Alford's children). *Id. See also* 26 U.S.C. § 2623 (same). Thus, under the Will as originally drafted, a 45% GSTT would apply to the remaining value of Trust D upon Ms. Alford's death, with only minimal set off for its pro rata portion of the $1 million GSTT exemption. [Citation omitted.]"

In other words, Alford argues that when the Darby Trust D was created, generation skipping may have been a vehicle to avoid federal estate taxation on the trust assets passed to each generation, but changes to both the federal GSTT and the federal estate tax exemption have now turned the table and optimal tax minimization would avoid the generation skip and expose the assets to estate taxation because they do not exceed the increased exemption. Applying K.S.A. 58a-416, would such a change "achieve the settlor's tax objectives" in a manner that is "not contrary to the settlor's probable intent"?

Questions of this nature have puzzled courts across the nation. Treatise law acknowledges that some courts have been sympathetic to a postmortem request to a modification that achieves more favorable tax treatment, but to say that such a request achieves the settlor's objectives in a way that is not contrary to probable intent can be a stretch.

"Indeed, many of the cases pretty plainly boil down to nothing more than an attempt to obtain, through post-mortem litigation, the benefits of better, or more sophisticated, estate planning than the settler was able or willing to procure while alive. So, though it is possible to rationalize each of these cases as merely cor-

recting 'mistakes,' in many, the petitioner is plainly asking the court to rewrite a document whose dispositive terms are exactly the way the settler intended them to be, simply to improve its tax efficiency. It is hardly surprising, then, that the courts sometimes balk at tax-driven reformations."

. . . .

". . . Proof that there was a more tax-efficient way to dispose of the settlor's property, therefore, is and should be far short of what is necessary to justify reformation of a governing instrument, even if there is also proof that the settler wanted to 'minimize taxes.' Under current law, it is always possible not just to 'minimize' the federal estate tax, but to eliminate it altogether, by leaving everything, in appropriate ways, to either a surviving spouse or a charity. Yet a great many people, who may well think of themselves as wanting to 'minimize taxes,' do not do so; they deliberately dispose of their property in ways that will not 'zero out' their taxes. When the claim is later made that the arrangement was not tax-efficient, it may be that the only way to make it more tax-efficient would have involved different dispositive provisions. The courts are quite naturally less inclined to do this." 5 Scott and Ascher on Trusts §33.5, pp. 2193-95 (5th ed. 2008).

See Bogert and Radford, Trusts & Trustees § 994, pp. 196-205 (3d ed. 2006) (and cases collected therein).

Here, Alford does not point us to any specific provision of the trust that indicates Darby's tax objectives or probable intent relative thereto. Alford argues on appeal only that "[c]onsistent with Senator Darby's intent, the district court's restatement of the will would also lower Trust D's future tax burden." It may be difficult to divine Darby's objectives, but it is not difficult to see that the requested modification could seriously jeopardize his overall intent manifested within the instrument, and this boundary may not be crossed. See Bogert and Radford, Trusts & Trustees § 994, pp. 197-98 ("power to modify the tax related provisions : . . is limited by the requirement that the settlor's overall intent, especially the dispositive provisions, not be disturbed by the modification").

Regarding Darby's tax objectives, we perceive within the four corners of the will nothing more than an oblique idea that taxes should be minimized or avoided by restricting or directing certain investment practices by the trustee as a part of Article IX. As to Trust D, however, there is merely a straightforward generation skipping bequest subject to a spendthrift clause. The generation skipping design may have been intended to minimize federal estate

taxes, but we decline to believe that Darby failed to understand it would expose the trust to the GSTT.

When Darby designed and executed his original will, the 1976 Tax Reform Act imposed the GSTT on trusts or similar arrangements having beneficiaries in more than one generation below that of the transferor, subject only to a $250,000 "grandchild exclusion." Pub. L. No. 94-455 §§ 2006-2622, 90 Stat. 1520, 1879 (1976); grandchild exclusion at I.R.C. § 2613(b)(6) (repealed 1986). The Tax Reform Act of 1986, effective in October 1986, retroactively repealed the original GSTT and substituted a flat tax rate on such transfers, subject to a new exemption of $1 million per transferor. Pub. L. No. 99-514 §§ 1431-33, 100 Stat. 2085, 2717 (1986) exemption at I.R.C. § 2631; see 26 U.S.C. § 2601 (2006) *et seq.* As recognized by most commentators at the time of the 1986 enactment, "there appear to be several methods by which one can avoid the full impact of the new [GSTT]." See, *e.g.,* Plant and Wintriss, *Generation Skipping Transfer Tax,* 17 U. Balt. L. Rev. 271, 272 (Winter 1988).

Whether we examine Darby's original will or his codicil, it is clear that he could have done a far better job of tax planning had he desired to avoid the GSTT implications for Trust D. This is especially true of his later testamentary device, the codicil, which ratified his dispository scheme despite the changes to the GSTT effective months prior to his execution of the codicil and which created an even more burdensome tax impact for his grandchildren. Because it is just as likely that Darby intended exposure to the GSTT for his grandchildren and avoidance of federal estate tax on the death of Alford as that he more generally sought to avoid or minimize overall taxation, there is no reason to believe that the requested modification somehow "achieves his tax objectives." In fact, it is just as likely that the proposed modification defeats his precise tax objective for Trust D.

An easier call, however, is that the proposed modification would seriously jeopardize Darby's overall intent for Trust D. In distributing all assets at Alford's death to whichever taxing authority she may appoint to pay anyone's federal or state estate taxes is not only directly contrary to the spendthrift clause prohibiting such powers

in beneficiaries, but it must be seen as completely destroying his intent to preserve assets for the second and third generations. Moreover, if the grant is construed as a general power of appointment as characterized by Alford in her appellate brief, the proposed modification may expose the trust assets to the claims of Alford's creditors in direct contravention to the express terms of the trust. See Restatement (First) of Property § 329 (1940).

In either event, we stand with a majority of courts in holding that a modification of trust provisions to achieve tax benefits cannot be validated when it would alter the dispositive provisions of the trust. See, *e.g.*, *Matter of Estate of Branigan*, 129 N.J. 324, 336-37, 609 A.2d 431 (1992) (court prohibited modification to power of appointment because it would alter the dispositive provisions and grandchildren would face possibility of losing inheritance); Bogert and Radford, Trusts & Trustees § 994, pp. 197-98.

Finally, we note that the limited power of appointment granted to Alford in the proposed modification may not have succeeded in achieving the desired tax result. We express no opinion in the matter but note in passing that the curious attempt to vest the assets in Alford for payment of estate taxes may not have satisfied the IRS that vesting sufficiently occurred to avoid the GSTT. Moreover, we note that the entire GSTT scheme is currently in a state of uncertainty, given scheduled expiration and unknown reinstatement. See, *e.g.*, McCouch, *The Empty Promise of Estate Tax Repeal*, 28 Va. Tax Rev. 369 (Fall 2008).

In summary, we conclude that the proposed modifications to the Darby Trust D would contravene applicable Kansas law. The district court must be reversed and this matter remanded with directions to invalidate the modifications.

Reversed and remanded with directions.

DAVIS, C.J., not participating.
GREENE, J., assigned.